<p style="color:red; text-align:center; font-size:2em;">**SEALED**</p>

<div style="text-align:center;">
UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA
</div>

| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | Misc No. 8:26MC67<br><br>**Filed Under Seal** |

<div style="text-align:center;">

APPLICATION OF THE UNITED STATES
FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)

</div>

The United States of America, moving by and through its undersigned counsel, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require Uber Technologies, Inc ("UTI")., a multinational technology company located in San Francisco, California, to disclose certain records and other information pertaining to the Target Accounts, as described in Part I of Attachment A. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

<div style="text-align:center;">LEGAL BACKGROUND</div>

1. UTI is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require UTI to disclose the items described in Part II of Attachment A. *See* 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(d). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

**A. Background, The West Gate Bank Incident, and Arrests of Padron and Barraza**

4. The FBI is investigating a large-scale conspiracy to steal money from Automatic Teller Machines ("ATM") through the use of malware, a scheme referred to as ATM jackpotting. More specifically, ATM jackpotting is a scheme in which a crew of individuals travels to different jurisdictions and installs malicious software ("malware") on an ATM hard drive ("HD") to force the ATM to withdraw cash. Each member of the crew has their own specific role. These individuals often have a pre-programmed computer and/or a Raspberry Pi[1] device to install the malware onto the ATM's HD. It is common for the person removing the ATM hard drive to dress like an ATM technician. A crew often has a "scout" to find ATMs, a driver, a person to install the malware, and a person to withdraw the cash from the ATM once the malware is installed. The investigation concerns possible violations of, inter alia, 18 U.S.C. § 1344 "Bank Fraud," 18 U.S.C. § 1030 "Fraud and related activity in connection with computers", and 18 U.S.C. § 2113 "Bank Burglary and Theft."

---

[1] A "Raspberry Pi" is a small, affordable type of computer with its own memory, processor, and drivers. While these devices can be used for many different purposes, based on my training and experience, in the ATM jackpotting context, I know these devices are used to facilitate the installation of malware on ATM HDs.

5.  Based on my training and experience, I'm aware that ATM jackpotting incidents often involve either a WhatsApp or Telegram group chat to coordinate the selection of the ATM, installation of the malware on the ATM as well as the instructions to input into the ATM to withdraw cash. As was the case with the West Gate Bank incident described below, bank surveillance of ATM jackpotting incidents often display each team member with headphones connected to a phone approaching the ATM and communicating through the phone with other co-conspirators during the incident.

6.  On or about October 26, 2024, at approximately 1:24 a.m., West Gate Bank ("WGB"), whose deposits are insured by the Federal Deposit Insurance Corporation and which is located at 1204 West O Street, Lincoln, Nebraska, received an Interactive Teller Machine ("ITM")2 hood door alarm on one of WGB's ITMs. This alarm triggers when the hood of an ITM or ATM is lifted, revealing the internal components and parts of the ITM/ATM. A manager at WGB's reviewed the ITM's security cameras and noticed a Hispanic male wearing a black surgical mask exit a white van and lift the hood of one the bank's ITMs. The manager reported what she had seen to the police.

7.  Shortly thereafter, Lincoln Police Department ("LPD") officers met WGB's manager at the WGB parking lot. The bank's manager informed officers that a van parked near the bank matched the description of the white van from WGB's surveillance footage. Around the same time, the van began to drive away and LPD officers conducted a traffic stop on the vehicle. Carlos Padron was driving the van and Luis Alejandro Berdugo Barraza was in the rear passenger seat. Neither Padron nor Barraza spoke English, and Padron utilized Google's Translate application

---

2 An Interactive Teller Machine is a machine that combines the functions of an ATM with the ability to video chat with a live teller. ITMs are sometimes called "branch in a box" systems because they provide a virtual banking experience similar to visiting a branch in-person.

from his cell phone to communicate with LPD officers. Padron, through Google Translate, advised that he and Barazza were trying to find a place to rest. Officers noticed there was a black surgical mask on the front passenger seat and detained Padron and Barraza.

8. Padron consented to a search of the van. Officers located Pin Tumbler lock keys, a Pin Tumbler lock picking tool set, a Transcend Solid-State Drive ("SSD") that was attached to a hardware mounting bracket, a Lenovo laptop computer with adapter cables, and multiple power tools including two drills. Based on my training and experience, this combination of tools and devices are frequently used by individuals to break into ITMs, access the ITMs' computers, and install malicious code that circumvents the ITM's software and forces the ITM to eject the cash inside. The laptop found in the van was powered on, unlocked, and found in a black backpack in the back-cargo portion of the van. Padron had a cell phone in his pocket, and three more cell phones were found in the van. Officers also found an external hard drive reader, a WiFi hotspot puck, a wireless keyboard, electronic cords, two black medical masks, and a yellow-handled screwdriver.

9. WGB's manager confirmed to LPD officers that the Transcend SSD found in the van was from one of WGB's ITMs. Using the Pin Tumbler lock key that was found in the van, LPD officers opened the ITM that had its hood door alarm triggered and learned that the SSD was missing from the ITM. The value of the SSD is between $5,000 and $10,000.

10. LPD officers performed additional investigation into the white van, which was a 2010 Ford Sprinter Van. The van's license plate was registered to a different vehicle, and registered to a business in Fenton, Missouri. A State of Missouri car title containing purchase information was recovered from the van. Officers contacted the individual who sold the van. The previous van owner said she sold the van on or about October 20, 2024, over Facebook marketplace for $4,000 cash to two Hispanic males.

11.     LPD investigators obtained surveillance video capturing events shortly before LPD officers arrived on the scene at about 1:48 a.m. on or about October 26, 2024. In sum, surveillance video shows the white van drive slowly by the ITM at WGB, and eventually enter the bank drive-through lanes, arriving near an ITM. The rear sliding door on the driver's side opens and a Hispanic male in dark clothing exits from the sliding van door wearing a black face mask. Images of the Hispanic male appear to match that of the jail booking photo of Barraza. The subject appears to unlock and open the bottom door of the ITM and then lift the top door open. The subject appears to be wearing a Bluetooth earpiece in his left ear. Another camera angle shows the subject appearing to manipulate something on the inside of the ITM. The subject then closes the top ITM door. It appears he has a screwdriver and possibly an interior part of the ITM in his left hand. He then closes the ITM door and re-enters the van through the same sliding door. The van then pulls away at about 1:24 a.m. At about 1:47 a.m., the van pulls back into the ITM drive through lane without stopping. At about 1:48 a.m., an LPD cruiser arrives.

12.     Neither Padron nor Barraza are employees of WGB or any company with permission to access ITMs at WGB. Padron is an undocumented citizen of Venezuela and had a Florida personal identification card. Barraza is an undocumented citizen of Colombia and had $323 U.S. currency on his person.

13.     Your affiant learned that a similar ITM incident involving Barraza occurred in Stony Brook, New York, on or about August 8, 2024. The Island Federal Credit Union ("IFCU") which has several ATMs located on Stony Brook University's campus, suffered several thefts from ATMs that resulted in a cash loss of approximately $59,180 from three of IFCU's ATMs. Stony Brook's University Police ("SBUP") conducted an investigation and determined that malicious software was installed on the ATMs SSDs. SBUP retrieved latent finger impressions from a hard

drive of one of the compromised ATMs. On or about November 13, 2024, SBUP submitted the latent impression to be searched in a Statewide Automated Biometric Identification System ("SABIS") to be compared to known finger impressions. On or about November 19, 2024, SABIS identified a match on the latent impression from the ATMs SSD to the left middle finger of Barraza.

**B.  Search of Devices Seized from Padron and Barraza**

14. On or about November 7, 2024, LPD executed a search warrant and extracted an image from the Lenova laptop that was seized from Barraza and Padron. During LPD's review of the image, LPD located Chrome browser searches for Anydesk and TeamViewer downloads. These applications, when installed on a computer, allow the device to be remotely accessed and controlled by another mobile device or computer.

15. On or about November 21, 2024, LPD executed search warrants on the four cell phones seized from Padron and Barraza, to include two Apple iPhones (iPhone1, iPhone2), a Motorola, and a OnePlus phone.

16. Padron and Barraza did not provide PIN codes for the two seized Apple iPhones. Thus, investigators were only able to retrieve limited data extractions which contained limited information. However, investigators were still able to obtain location data from iPhone1, which revealed that the phone was in the vicinity of the following ATM-jackpotting incidents on or around the dates that those incidents occurred:

   a. Between on or about July 5, 2024, and on or about July 8, 2024, Heartland Credit Union, Hutchinson, Kansas, with an approximate loss of $50,000;

b. Between on or about July 13, 2024, and on or about July 24, 2024, Washington State Employee Credit Union, Seattle, Washington, with an approximate loss $676,235;

c. Between on or about September 4, 2024, and on or about September 7, 2024, First Bank, Thomasville, North Carolina, with an approximate loss $194,320.

17. Data extractions from the Motorola and OnePlus phones contained Telegram and WhatsApp3 conversations with multiple participants that were in Spanish and made references to ITMs and accessing their hard drives.

a. The participants within a Telegram message thread recovered from the OnePlus phone included the following:

| User ID | Display Name |
| --- | --- |
| 7898791472 | Maca |
| 7468665470 | Dmnt444 |
| 6746640336 | Cj Cj |
| 5621285700 | Goku |
| 7502952009 | Good God |
| 7754853317 | La Al |
| 7522891998 | P |
| 7224953166 | Pedro P |
| 5884826285 | Po |
| 8124368769 | Prome Theus |
| 6284706367 | Prometheus Truth |

---

3 Telegram and WhatsApp are cloud-based, cross-platform, social media and instant messaging services. Telegram and WhatsApp offer end-to-end encryption, which is a form of encryption where the decryption keys are stored only on the users' devices and are not retained by the provider. Accordingly, the contents of communications on Telegram and WhatsApp are more difficult to access in a readable format. Based on my training and experience, individuals who are engaged in criminal conspiracies often use providers like Telegram or WhatsApp because their communications are encrypted and more difficult for law enforcement to access.

b. On or about October 24, 2024, at 7:38:43 p.m., the OnePlus phone, operating the Telegram account Maca, received the below Telegram message in Spanish from Telegram account "Prome Theus":



Using open-source translation tools, this message generally translates to, "Turn on the laptop and plug in the disk that they stuck in that ATM." Based on my training and experience, in ATM jackpotting schemes, the ATM's hard drive is removed from the ATM and connected to a laptop via a USB or similar cable and the laptop is used to install the malware on the ATM's hard drive.

c. On or about October 25, 2024, at 9:49:33 p.m., the below WhatsApp message was received on the Motorola phone from WhatsApp account 5215649097369@s.whatsapp.net Prome:



Using open-source translation tools, this message translates to, "I have to see something from Hysoung quickly". Hyosong is a South Korean company that manufactures and distributes ATMs worldwide. WGB's ATM was made by Hyosong.

d.  On or about October 25, 2024, at 11:25:46 p.m., the below WhatsApp message was received on the Motorola phone from WhatsApp account 5214461125820@s.whatsapp.net Pamoero:



Using open-source translation tools, this message translates to, "Tell him to infect you at least 1 to see if the virus is okay". Based on my training and experience, the context of using the word virus is the same as malware.

e.  The Motorola extraction contained a WhatsApp conversation from on or about October 26, 2024, at approximately 12:08 a.m., in which L.P., the device owner, using WhatsApp telephone number 336-417-1308, sent a photo (below) of WGB located at 4955 O Street, Lincoln, Nebraska to "Pamoero" at WhatsApp telephone number 5214461125820. This bank location is 15 minutes east and on the same street as the WGB branch where Padron and Barraza were arrested hours later as described above.



f. On or about October 26, 2024, at 12:11:41 a.m., the below WhatsApp message was received on the Motorola phone from WhatsApp account 5214461125820@s.whatsapp.net Pamoero:



Using open-source translation tools, the message translated to, "Call Anibal".

g. On or about October 26, 2024, the Motorola phone logged two voice calls on the WhatsApp application to 5215649097369@s.whatsapp.net Prome. As noted in the list of contacts above, "Prometheus" is sometimes separated into two names: "Prome Theus". That this call occurred the same day that Pamoero directed the user of the Motorola phone to contact Anibal suggests that Prome, or Prometheus, is an individual that also goes by the name of "Anibal."

h. On or about October 26, 2024, at 1:46:50 a.m., the below Telegram message was received on the OnePlus phone to the device owner "Maca" from Telegram account "Prome Theus":



Using open-source translation tools, this message translates to, "Stick the disc on the atm".

## C. Telegram Records Lead to marcosana@protonmail.com

18. Pursuant to valid legal process, Telegram provided records pertaining to the accounts that were found within Telegram message threads on the OnePlus phone, including those detailed above. These records revealed Internet Protocol ("IP") address[4] information to include the last login IP address and the last login date for the below Telegram accounts:

| User ID | Display Name | Last Login IP Address | Last Login Date UTC |
|---|---|---|---|
| 7898791472 | Maca | 172.59.173.38 | 10/26/2024  6:49:32 |
| 7468665470 | Dmnt444 | 23.115.39.61 | 11/23/2024 03:49:13 |
| 6746640336 | Cj Cj | 200.68.139.43 | 02/09/2025 22:31:04 |
| 5621285700 | Goku | 187.234.102.14 | 02/10/2025 07:19:11 |
| 7502952009 | Good God | 2607:fb90:392c:84eb:444e:90ff:fe5c:8ca4 | 10/26/2024  8:10:42 |
| 7754853317 | La Al | 172.59.185.111 | 10/26/2024  6:50:35 |
| 7522891998 | P | 172.59.171.21 | 10/4/2024  1:42:04 |
| 7224953166 | Pedro P | 76.157.96.31 | 01/20/2025 21:16:02 |
| 5884826285 | Po | 172.59.72.92 | 10/26/2024  8:53:23 |
| 8124368769 | Prome Theus | 45.80.185.9 | 11/23/2024 18:53:46 |
| 6284706367 | Prometheus Truth | 185.153.177.202 | 10/21/2024 17:46:14 |

---

[4] An "Internet Protocol address" or "IP address," is a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

19. Pursuant to valid legal process, Apple provided records that identified Apple accounts that accessed the above IP addresses during or around (within four hours) the time of the last login as identified by Telegram records above. These records identified that IP address 185.153.177.202 accessed the marcosana@protonmail.com on or about October 21, 2024, at 17:47:36.

20. As indicated in the chart above, Telegram records show that the last logins to the Telegram accounts "Prome Theus" and "Prometheus Truth" were made from the IP addresses 45.80.185.9 and 185.153.177.202 respectively. According to open source information, these IP addresses are owned by NordVPN[5].

21. On or about April 10, 2025, Apple responded to a 2703(d) order that requested information related to marcosana@protonmail.com. Apple provided the subscriber's name as Alex Caicedo and the billing name as Anibal Alexander Canelon Aguirre ("Aguirre"). As noted above, the Motorola device seized from Padron and Barraza contained a WhatsApp communication that said, "Call Anibal[.]"[6] Apple's response disclosed that the marcosana@protonmail.com had either updated and or redownloaded NordVPN, AnyDesk Remote Desktop, TeamViewer Remote Control applications, Telegram Messenger and WhatsApp Messenger from Apple's App Store to an Apple device within the period between on or about January 1, 2024, and on or about March 21, 2025. Notably, and as described above, these are all applications that have been used in furtherance of the scheme under investigation.

---

5 NordVPN is a service provider of virtual private networks (VPN) and is located within the Republic of Panama. A virtual private network (VPN) is a service that protects an internet connection and privacy online. VPNs create an encrypted tunnel for data and protect online identity by hiding a user's IP address.

6 The FBI has also linked the marcosana@protonmail.com with at least one additional account in the name of Anibal Canelon. Pursuant to valid legal process, Spotify produced records for a Spotify account registered to the email account marcosana@protonmail.com, According to these Spotify records, the registered name on the account is "Anibal Canelon."

22.     On April 22, 2025, Paypal responded to valid legal process that requested subscriber and transactional information regarding account marcosana@protonmail.com. Paypal provided the account owner's name as Anibal Alexander Canelon Aguirre. The Paypal account sent funds to aaca76@protonmail.com and the notes of the transaction stated, "Software Development".

23.     Pursuant to valid legal process, Apple provided the contents of the iCloud account registered to the marcosana@protonmail.com. A photo of a confirmation from Booking.com was located and the confirmation email was sent to larr79@proton.me.

24.     Pursuant to valid legal process, UTI provided payment and trip information regarding accounts marcosana@protonmail.com and larr79@proton.me. The following partial card numbers were associated with the accounts:

|  | bank_name | card_type | first_6_digit | last_4_digit | exp_date |
|---|---|---|---|---|---|
| Target Account | BANCOLOMBIA S.A. | MasterCard | 530691 | 1961 | 5/2028 |
| Target Account | BANESCO, S.A. | MasterCard | 517183 | 3361 | 4/2026 |
| Target Account | BANCOLOMBIA S.A. | MasterCard | 530691 | 1471 | 12/2028 |

25.     On December 9, 2024, a grand jury sitting in the District of Nebraska returned an indictment charging Barraza and Padron with violations of 18 U.S.C. §§ 2113(b) (Bank Theft), 371 (Conspiracy), and 2 (Aiding and Abetting), for their roles in the WGB theft described above.

26.     On December 9, 2025, a grand jury sitting in the District of Nebraska returned an indictment charging Aguirre with violations of 18 U.S.C. §§ 1349 (Conspiracy to Commit Bank Fraud), 371 (Conspiracy to Commit Bank Burglary and Fraud in Connection with Computers), 1956(h) (Conspiracy to Commit Money Laundering) and 2339A (Conspiracy to Provide Material Support to Terrorists).

27.     Basic subscriber information and other non-content data (further described in Part II of Attachment A) associated with these accounts will be valuable to assist in the identification

and location of other co-conspirators involved in ATM jackpotting. Records and data obtained pursuant to this order could assist investigators to identify the real location, active communication mediums, and further potential involvement in criminal activity by the users of the Target Accounts.

### REQUEST FOR ORDER

28.     The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individual(s) who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that UTI be directed to produce all items described in Part II of Attachment A to the proposed Order.

29.     The United States further requests that the Order require UTI not to notify any person, including the subscribers or customers of the account(s) identified per the requirements set forth in Part I of Attachment A, of the existence of the Order for one year. *See* 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." *Id.* In this case, such an order would be appropriate because the requested Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to

believe that notification of the existence of the requested Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, and change patterns of behavior. *See* 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

30. The United States further requests that the Court order that this application and any resulting order be sealed until further order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

        Respectfully submitted,

*/s/ Sean P. Lynch*
Sean Lynch
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE 68102
Tel: (402) 661-3757

# ATTACHMENT A

**I.     The Account(s)**

The Order applies to certain records and information associated with the following payment cards:

| Bank_name | card_type | first_6_digit | last_4_digit | exp_date |
|---|---|---|---|---|
| BANCOLOMBIA S.A. | MasterCard | 530691 | 1961 | 5/2028 |
| BANESCO, S.A. | MasterCard | 517183 | 3361 | 4/2026 |
| BANCOLOMBIA S.A. | MasterCard | 530691 | 1471 | 12/2028 |

**II.    Records and Other Information to Be Disclosed**

Uber Technologies, Inc., is required to disclose the following records and other information, if available, to the United States for each account identified according to the specifications in Part I of this Attachment ("Accounts"):

A.    The following information about the customers or subscribers of the Accounts from January 1, 2024 to the present:

1. Names (including subscriber names, user names, and screen names);
2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
3. Trip information to include, but not limited to pickup and drop-off locations, communication records (non-content);
4. Length of service (including start date) and types of service utilized; and
5. Telephone or instrument numbers, device information (including MAC addresses, [the following items apply only to cell phones:] Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));
6. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
7. Means and source of payment for such service (including any credit card or bank account number) and billing records.